

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-13-2002

# PA Pharmacists Assoc v. Houstoun

Precedential or Non-Precedential:

Docket 0-1898

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"PA Pharmacists Assoc v. Houstoun" (2002). *2002 Decisions.* Paper 167.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/167

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed March 13, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1898

PENNSYLVANIA PHARMACISTS ASSOCIATION; BELL
EDGE PHARMACY; BROAD STREET APOTHECARY;
BURNS PHARMACY; CAMBRIA PHARMACY #3;
CHRISTIAN STREET PHARMACY; ELWYN PHARMACY;
ESTERSON PHARMACY; FOSTERS PHARMACY; GETWELL
PHARMACY; MCKEAN STREET PHARMACY; ROSICA
PHARMACY; S&S COMMUNITY DRUG, INC.; SILVERMAN
PHARMACY; TIOGA DRUG COMPANY; WELDON
PHARMACY, and other Similarly Situated Pharmacies;
TIRELLI, INC., dba BROAD STREET APOTHECARY;
ROBERT SCHREIBER, dba BURNS' PHARMACY;
CAMBRIA PHARMACIES, INC.; BARRY JACOBS, dba
ELWYN PHARMACY; 2401 EAST YORK STREET, INC., dba
ESTERSON'S PHARMACY; RIAZ U. RAHMAN, dba
GETWELL PHARMACY; FOSTER PHARMACY, INC.;
HAUSSMANN'S PHARMACY; MCKEAN STREET
PHARMACY, INC.; THOMAS BETTERIDGE, dba ROSICA
PHARMACY; WELDON PHARMACY, INC,

        Appellants

v.

FEATHER O. HOUSTOUN

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No. 99-cv-00491)
District Court Judge: Ronald L. Buckwalter

Argued April 20, 2001

Before: ALITO, McKEE, and ALARCON, Circuit Jud ges.

Argued En Banc November 28, 2001

Before: BECKER, Chief Judge, MANSMANN, SCIRICA,
NYGAARD, ALITO, ROTH, McKEE, RENDELL, BARRY,
AMBRO, and FUENTES, Circuit Judges

(Opinion Filed: March 13, 2002)

Gregory L. Liacouras (Argued)
Leslie H. Smith
Joseph W. Marshall, III
Liacouras & Smith, LLP
1515 Market Street, 9th Floor
Philadelphia, PA 19102

Attorneys for Appellants

Joseph McHale
Kimberley A. Hendrix
Stradley, Ronon, Stevens &
 Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098

John A. Kane (Argued)
Commonwealth of PA
Office of Legal Counsel
Department of Public Welfare
P.O. Box 2675
Health & Welfare Building
Harrisburg, PA 17120

Attorneys for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge, with whom Judges NYGAARD, ROTH, BARRY, AMBRO and FUENTES join:

The Pennsylvania Pharmacists' Association[1] and 16 pharmacies operating in southeastern Pennsylvania brought this action under 42 U.S.C. S 1983 against Feather O. Houstoun, the Secretary of the Pennsylvania Department of Public Welfare (the "Department"), to challenge the reimbursement rates paid to pharmacies under Pennsylvania's Medicaid program. The plaintiffs claimed that the Department, in administering its HealthChoices Southeast program ("HealthChoices"), was violating provisions of Title XIX of the Social Security Act (the "Medicaid Act"), 42 U.S.C. SS 1396a(a)- 1396v. The plaintiffs' principal claim was based on 42 U.S.C. S 1396a(30)(A) ("Section 30(A)"). In accordance with its interpretation of prior circuit precedent, the District Court held that the plaintiffs could assert their Section 30(A) claim under S 1983, but the District Court nevertheless granted summary judgment against the plaintiffs. We now hold that the plaintiffs, as Medicaid providers, may not assert their claims under S 1983, and we therefore affirm the order of the District Court on this alternative ground.

I.

Medicaid is a cooperative federal-state program under which the federal government furnishes funding to states for the purpose of providing medical assistance to eligible low-income persons. See 42 U.S.C. S 1396; Rite Aid of Pennsylvania, Inc. v. Houstoun, 171 F.3d 842, 845 (3d Cir. 1999). If a state chooses to participate in the program, it must comply with the Medicaid Act and implementing regulations promulgated by the Secretary of Health and Human Services ("HHS"). See Wilder v. Virginia Hosp.

_____

1. The Pennsylvania Pharmacists' Association is a non-profit corporation representing over 440 independent pharmacies and over 1,000 pharmacists employed at these pharmacies.

Ass'n., 496 U.S. 498, 502 (1990). In order to participate, a state must submit a medical assistance plan to the Secretary of HHS and obtain approval of the plan. See 42 U.S.C. S 1396; 42 C.F.R. S 430.10 (2001). With further administrative approval, a state may amend a previously approved plan. See 42 C.F.R. S 430.12 (2001).

Under the Medicaid Act, a state is required to pay for certain enumerated services and may choose to pay for certain additional services. 42 U.S.C. S 1396a(a)(10)(A); 42 C.F.R. S 440.210 (2001). Pennsylvania includes prescription drugs among its optional services. See 42 U.S.C. S 1396d(a)(12); 42 C.F.R. S 440.120(a) (2001).

Until 1997, Pennsylvania compensated participating pharmacists directly under a "fee-for-service" program. Payments to these pharmacies generally consisted of two components: (1) ingredient cost reimbursement and (2) a dispensing fee. Pharmacies were compensated for brand-name drugs based on the "estimated acquisition cost" of the drugs[2] plus a "reasonable" dispensing fee. See 42 U.S.C. S 1396(a)(30)(A); 42 C.F.R. S 447.300 et seq. Pharmacists were compensated for generic drugs using acquisition cost limits established by HHS plus a reasonable dispensing fee.

In 1997, the Pennsylvania Department of Public Welfare began to implement its HealthChoices program, a mandatory managed care program operated in five counties in the southeastern part of the state pursuant to an HFCA waiver from certain provisions of the Medicaid Act.[3] The Department contracted with four health management organizations ("HMOs") to administer HealthChoices. Three of the four HMOs administer pharmacy benefits through contracts with pharmacy benefits managers. When an HMO contracts with a pharmacy benefits manager, the HMO and the pharmacy benefits manager set the rates at which

_____

2. The "estimated acquisition cost" is the"agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." 42 C.F.R. S 447.301 (2001).

3. The waiver applies to 42 U.S.C. S 1396a(a)(1)(statewide scope), S 1396a(a)(10)(B)(comparability of services), and S 1396a(a)(23)(freedom of choice).

4

pharmacies are reimbursed. The pharmacy benefits manager then contracts directly with the participating pharmacies to provide outpatient pharmacy services to eligible beneficiaries.

In order to participate in HealthChoices, the named pharmacy plaintiffs entered into standardized Medical Assistance Provider Agreements with the Department. The Agreements cover the provision of brand-name and generic prescription drugs to eligible beneficiaries and obligate the Department to reimburse the contracting pharmacies in accordance with state and federal law.

In January 1999, the plaintiffs commenced this action in the United States District Court for the Eastern District of Pennsylvania and requested declaratory and injunctive relief. The plaintiffs' principal claim was that the new payment rates violate Section 30(A), which requires a state Medicaid plan to assure that payments "are consistent with efficiency, economy, and quality of care" and"are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." The plaintiffs alleged that the pharmacy benefits managers, without oversight from the Department, had decreased the outpatient pharmacy benefit rates so much that they were below the cost of acquiring and dispensing the drugs.

The District Court certified a class of pharmacy plaintiffs and denied the Department's motion to dismiss the complaint, holding that the plaintiffs had "a private right to enforce [Section 30(A)]." Pennsylvania Pharmacists Ass'n v. Houstoun, No. CIV.A. 99-491 (E.D. Pa. October 21, 1999). As support for its holding on this point, the Court cited a footnote in a prior panel opinion of this Court. See Rite Aid of Pennsylvania, Inc. v. Houstoun, 171 F.3d 842, 850 n. 7 (3d Cir. 1999).

The District Court subsequently granted the defendant's motion for summary judgment. Pennsylvania Pharmacists Ass'n v. Houstoun, No. CIV.A. 99-491, 2000 WL 730344, at * 1 (E.D. Pa. June 7, 2000). The Court held that the Department, in implementing its new program, had

5

properly considered efficiency, economy, and access to quality pharmacy services, that its procedures were neither arbitrary nor capricious, and that the resulting payment rates did not violate Section 30(A). Pennsylvania Pharmacists Ass'n, 2000 WL 730344, at * 3–5.

The Plaintiffs appealed, and their arguments were heard before a regular panel. Under a longstanding practice of our Court, a panel may not overrule another panel decision. A footnote in the panel opinion in Rite Aid appeared to hold that a provider may assert a Section 30(A) claim under S 1983, but the footnote provided no elaboration.4 By the time of the panel argument in this case, the other courts of appeals were divided on this issue. Prior to the issuance of a panel decision, we granted rehearing en banc primarily for the purpose of considering the S 1983 issue.

II.

The threshold issue that we must consider is whether the plaintiffs, as Medicaid providers (as opposed to Medicaid recipients), may assert a Section 30(A) claim under 28 U.S.C. S 1983. Section 1983 provides a private right of action against any person who, acting under the color of state or territorial law, abridges "rights, privileges, or immunities secured by the Constitution and laws" of the United States. See also Maine v. Thiboutot, 448 U.S. 1, 4 (1980). In order to seek redress under S 1983, a plaintiff "must assert the violation of a federal right," and not merely a violation of federal law. Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989). Thus, a plaintiff alleging a violation of a federal statute may not proceed under S 1983 unless 1) the statute creates "enforceable

_____

4. The Rite Aid panel wrote as follows in footnote 7 of the opinion:

> The Department argues at least in part that Rite Aid and the PPA [Pennsylvania Pharmacists Association] may not sue to enforce [certain] Medicaid regulations as section 30(A) "does not support a private cause of action." Brief at 27. The district court rejected this
> argument and we agree with this result. Rite Aid , 998 F. Supp. at 525–26.

171 F.3d at 850.

6

rights, privileges, or immunities within the meaning of S 1983" and 2) Congress has not "foreclosed such enforcement of the statute in the enactment itself." Wright v. Roanoke Redevelopment and Housing Auth., 479 U.S. 418, 423 (1987).

In considering the first of these requirements –– that the statute must create an enforceable right, privilege, or immunity –– we must determine whether the three conditions identified by the Supreme Court in Wilder and Blessing v. Freestone, 520 U.S. 329 (1997), are satisfied. First, the provision in question must have been"intend[ed] to benefit the putative plaintiff." Wilder , 496 U.S. at 509 (quoting Golden State Transit Corp., 493 U.S. at 106)(brackets added in Wilder); see also Blessing, 520 U.S. at 340. Second, the right allegedly protected by the statute must not be so "vague and amorphous" that its enforcement would strain judicial competence. Blessing, 520 U.S. at 340-41; Wilder, 496 U.S. at 509. Finally, the statute must unambiguously impose a binding obligation on the states, id., and thus the provision giving rise to the asserted right must be couched in "mandatory, rather than precatory, terms." Blessing, 520 U.S. at 341.

Once these requirements are satisfied –– and the existence of a federal right is established –– a rebuttable presumption arises that the right is enforceable under S 1983. Blessing, 520 U.S. at 341. This presumption may be rebutted by showing that Congress expressly or impliedly foreclosed an action under S 1983. Id.; see also Livadas v. Bradshaw, 512 U.S. 107, 133 (1994).

III.

A.

In the present case, the focus of our inquiry is the requirement that the provision in question must have been intended to benefit the plaintiffs. Blessing, 520 U.S. at 340; Wilder, 496 U.S. at 509; Golden State Transit Corp., 493 U.S. at 106; Wright, 479 U.S. at 430. It is important to keep in mind that the question whether a statute is intended to benefit particular plaintiffs is quite different from the

question whether the statute in fact benefits those plaintiffs[5] or even whether Congress knew that the statute would benefit those plaintiffs. In the present case, it may well be that Section 30(A) in fact benefits pharmacies in some states and that Congress realized this in enacting that provision. For example, if Section 30(A) were not on the books, a state plan might provide lesser access to pharmacy services than Section 30(A) requires. In any such state, Section 30(A) presumably has the effect of increasing drug sales, and these increased drug sales presumably benefit pharmacies -- as well as drug wholesalers, drug manufacturers, many other businesses (e.g., lessors of pharmacy premises, cleaning service firms retained by pharmacies, trash collection companies retained by pharmacies, private security firms retained by pharmacies), employees of all of these businesses, etc. Congress undoubtedly realizes that federal subsidies have such ripple effects, but it would be outlandish to argue that the Wilder/Blessing intended-to-benefit requirement permits all of these businesses and individuals to assert Section 30(A) claims in federal court. Our inquiry, consequently, is quite narrow: did Congress, in enacting Section 30(A), intend to benefit providers?

In attempting to answer this question, the Supreme Court has instructed us to pay careful attention to the way in which the statutory provision at issue is framed. In Cannon v. University of Chicago, 441 U.S. 677, 689 (1979), the Court wrote that the question whether a statute is enacted for the benefit of a particular class of plaintiffs "is

_____

5. If the intended-to-benefit requirement could be satisfied simply by showing that a plaintiff in fact benefits from the law in question, the requirement would be superfluous. No plaintiff may assert a claim in federal court without establishing Article III standing, and this demands, among other things, that the plaintiff demonstrate "injury in fact." See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). A plaintiff asserting a claim based on an alleged violation of a federal law cannot demonstrate injury in fact unless proper enforcement of the law would benefit the plaintiff. Therefore, if the intended-to-benefit requirement could be met simply by showing that the plaintiff would benefit by proper enforcement, that requirement would add nothing to the injury-in-fact test.

answered by looking to the language of the statute itself."
The Court noted the importance of any "right- or duty-
creating language" in the statute. Id. at 690 n.13. Moreover,
in holding that the statute in that case was intended to
benefit the plaintiffs, the Court observed that the statute
was "phrased in terms of the persons benefited" and was
"draft[ed] . . . with an unmistakable focus on the benefited
class." Id. at 691, 692 n.13. More recently, in Alexander v.
Sandoval, 121 S.Ct. 1511, 1520 (2001), the Court again
commented on the importance of the particular phrasing of
a statute in this regard.

While Cannon and Alexander concerned the implication
of a private right of action under a statute, rather than the
assertion of a statutory claim under S 1983, the tests
applied in these contexts partially overlap,6 and both tests
ask whether the statute at issue was intended to benefit the
putative plaintiff or plaintiffs. See Wright, 479 U.S. at 432-
33 (O'Connor, J., dissenting). Thus, in cases applying the
Wilder/Blessing test, the Court has also relied on the terms
in which the statute is drafted.

Wilder itself is illustrative. In Wilder , a hospital filed a
S 1983 action asserting a violation of the now-repealed
Boren Amendment to the Medicaid Act, 42 U.S.C.
S 1396a(a)(13) (1994) (repealed 1997). The Boren
Amendment required a state Medicaid plan to provide a
class of providers7 with payments that were "reasonable
_____

6. In determining whether a statute creates an implied right of action,
the Supreme Court uses the four-part test of Cort v. Ash, 422 U.S. 66
(1975), to determine whether Congress intended to create a private
remedy. Under this test, the Court considers (1) whether the plaintiff is
within the class " `for whose especial benefit' the statute was enacted,"
(2) whether "there is any indication of legislative intent, explicit or
implicit, either to create such a remedy or to deny one," (3) whether a
private remedy would be "consistent with the underlying purposes of the
legislative scheme," and (4) whether "the cause of action [is] one
traditionally relegated to state law, in an area basically the concern of
the States." Id. at 78 (citations omitted). A S 1983 plaintiff need not
prove
that Congress specifically intended that a particular statutory right be
enforceable under S 1983 but instead need only meet the three-part test
outlined above. Wilder, 496 U.S. at 509 n. 9.

7. Namely, hospitals and nursing and intermediate care facilities. See
Wilder, 496 U.S. at 502 n.2.

9

and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" that comply with applicable state and federal laws and standards. Id. Holding that there was "little doubt" that the Boren Amendment was intended to benefit these providers, the Supreme Court stressed the Boren Amendment's cost-reimbursement language, 496 U.S. at 503, and noted that the Amendment "establishe[d] a system for reimbursement of providers and [was] phrased in terms benefitting health care providers." Wilder, 496 U.S. at 510 (emphasis added). Thus, the Court relied on language in the Boren Amendment that measured the adequacy of payments in relation to the economics of providers, i.e., their need to cover their reasonable costs. As the Court later emphasized in Suter v. Artist M., 503 U.S. 347, 357 (1992), Wilder "took pains to analyze the statutory provisions in detail."

B.

With these standards in mind, we focus on the language of Section 30(A). Section 30(A) provides that a state plan for medical assistance must:

> [P]rovide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

Because this language is -- to put it mildly-- complex, it is helpful to break it down. Under Section 30(A), a state must provide "methods and procedures." These "methods and procedures" must assure that payments to providers produce four outcomes: (1) "efficiency," (2) "economy," (3) "quality of care," and (4) adequate access to providers by Medicaid beneficiaries.[8]

_____

8. We use the phrase "adequate access" simply as shorthand for the statutory requirement that providers be "available under the plan at

10

It seems clear to us that the first two required outcomes -- "efficiency" and "economy" -- relate to the state program, not providers, i.e., Section 30(A) requires that a state program set payments at levels that make the program efficient and economical.9 What sort of payments would make a program inefficient and uneconomical? Payments that are too high. Accordingly, the directive to achieve "efficiency" and "economy" was obviously not intended to benefit providers.

That leaves the directives to provide "quality of care" and adequate access. These directives are "draft[ed] . . . with an unmistakable focus on" Medicaid beneficiaries, not providers. Cannon, 441 U.S. at 691. They are"phrased in terms benefiting" Medicaid recipients, Wilder , 496 U.S. at 510, and these are the persons that Congress intended to benefit. If Congress had wanted to look after pharmacies, it would hardly have framed Section 30(A) in the terms it chose.

The language of Section 30(A) contrasts sharply with that of the Boren Amendment, which was interpreted in Wilder as intended to benefit the relevant providers. As previously noted, the Boren Amendment required a state Medicaid plan to provide payments to providers that were "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" that comply with applicable state and federal laws and standards. Pub. L. No. 96-499, S 962(a), 94 Stat. 2650 (1980). It was thus "phrased in terms benefitting" providers

_____

least to the extent that such care and services are available to the general population in the geographic area." We do not suggest that "adequate access" in the lay sense of the term will or will not meet this statutory requirement.

9. Although the plaintiffs argue that these terms refer to the operation of pharmacies, this does not make sense. Suppose payments to pharmacies were set far above cost. That would not make them inefficient or uneconomical, i.e., "wasteful." Webster's Third New International Dictionary (1971). It would simply make them very profitable. Conversely, suppose payments to pharmacies were set well below costs. That also would not make them inefficient or uneconomical. It would simply make participation in the Medicaid program unprofitable and might lead them to withdraw.

11

and measured the sufficiency of payments by reference to the economics of providers. It plainly manifested concern for the economic well-being of providers. Section 30(A), unlike the Boren Amendment, does not demand that payments be set at levels that are sufficient to cover provider costs. Unlike the Boren Amendment, it evinces no direct concern for the economic situation of providers. Instead, it demands that payments be set at levels that are sufficient to meet recipients' needs. It is "phrased in terms benefitting" recipients, and the adequacy of payments is measured in relation to the health needs of recipients. It manifests concern solely for the well-being of recipients. It is therefore apparent from the statutory language that the intended beneficiaries of Section 30(A) are recipients, not providers.

The principal dissent disagrees with this analysis and maintains that the Boren Amendment and Section 30(A) "confer nearly identical rights on providers." Principal Dissent at 23. The principal dissent makes two principal points. First, it dismisses the significance of the presence in the Boren Amendment and the absence from Section 30(A) of language focusing on provider costs. Second, it argues that quality of care played essentially the same role in the Boren Amendment as it does in Section 30(A). Neither point is well taken.

The language in the Boren Amendment focusing on provider costs is telling because it manifests a clear congressional concern for the economic plight of providers and an intent to benefit them. We are convinced that this statutory language was the basis for the Wilder Court's statement that the Boren Amendment was "phrased in terms benefitting" providers. 496 U.S. at 510. The principal dissent interprets this statement to mean simply that the Boren Amendment "required states to establish a scheme for provider reimbursement." See Principal Dissent at 24. But if this interpretation were correct, the Supreme Court's full sentence ("The provision establishes a system for reimbursement of providers and is phrased in terms benefitting health care providers") would say exactly the same thing twice ("The provision establishes a system for reimbursement of providers," 496 U.S. at 510, and

12

"require[s] states to establish a scheme for provider reimbursement," Principal Dissent at 23). We therefore disagree with the principal dissent and believe that the reference to phrasing pertains to the Boren Amendment's cost-reimbursement language.

This cost-reimbursement language is also of particular significance in, to use the principal dissent's phrase, "the dynamic of the real world of healthcare."[10] Principal Dissent at 24. Cost reimbursement schemes[11] are generally favorable to providers and greatly disliked by those required to do the reimbursing.[12] The House Committee Report recommending repeal of the Boren Amendment cited a Congressional Budget Office estimate that its elimination would save $1.2 billion over four years,[13] and the National Governors Association provided even higher estimates.[14] We

_____

10. In its description of the "real world""context" of this case, the principal dissent (at 24, 25-26) summarizes the plaintiffs' (but not the defendant's) evidence about the effect of the new rates on access to pharmacies. But (1) the plaintiffs' position is disputed, (2) the District Court, which reached the merits of the access issue, held that the plaintiffs had not adduced sufficient evidence to show that the access requirement was not being met, Pennsylvania Pharmacists Ass'n, 2000 WL 730344, at * 6-8, and (3) the principal dissent does not purport to have examined or to reach the merits of this issue. We express no view whatsoever on the merits of this question.

11. Before the Boren Amendment, states, as a practical matter, tended to pay for "the actual costs incurred by hospitals in providing care to Medicaid recipients, regardless of disparities in costs or efficiencies among hospitals." New Jersey Hosp. Ass'n v. Waldman, 73 F.3d 509, 511 (3d Cir. 1995). The Boren Amendment replaced this actual-cost-reimbursement scheme with a reasonable-cost-reimbursement scheme. See id. at 514-15.

12. The National Governors Association unanimously recommended repeal of the Boren Amendment. See 1997 WL 8219815 (March 11, 1997) (Testimony of Govs. Miller and Leavitt before Sen. Fin. Comm.); 1996 WL 7135617 (Feb. 21, 1996)(Statement of Govs. Thompson, Miller, Chiles, Engler, Leavitt, and Romer before House Commerce Comm.)("The Boren amendment and other Boren-like statutory provisions must be repealed. `One hundred percent reasonable cost reimbursement' must be phased out . . . .").
13. H.R. Rep. 149, 105th Cong., 1st Sess. 547 (1997).

14. See 1997 WL 8219815 (March 11, 1997) (Testimony of Govs. Miller and Leavitt before Sen. Fin. Comm.).

13

take no side in the policy debate about cost reimbursement, but we think that it is highly unrealistic to minimize the significance of the presence in the Boren Amendment of cost-reimbursement language. This language was plainly a boon for providers, Congress surely understood its implications, and its inclusion in the Boren Amendment was an unmistakable sign of a congressional desire to benefit providers.

The principal dissent also misinterprets the Boren Amendment as containing a quality-of-care requirement similar to that in Section 30(A). See Principal Dissent at 24 (Boren Amendment "mandates minimum reimbursement rates defined by reference to quality of care . . . .") id. at 33 (rates must be "sufficient to ensure quality of care"); id. at 33 (same). In fact, however, quality of care played a decidedly secondary role in the Boren Amendment. Whereas quality of care is a primary benchmark for setting payments in Section 30(A), the Boren Amendment simply provided that reimbursements were to be calculated by reference to the reasonable costs of providers that were operating in compliance with other applicable legal requirements -- in the precise language of the Amendment, "with applicable State and Federal laws, regulations, and quality and safety standards . . . ." 42 U.S.C. Section 1396a(a)(13)(A) (repealed 1997). Thus, for example, in determining the reasonable costs of a nursing home, the Boren Amendment looked to nursing homes that were complying with state fire safety laws rather than those that cut costs by doing without fire escapes, smoke detectors, etc. (The principal dissent obscures this point by repeatedly eliding the reference to "State and Federal laws[and] regulations" and referring only to "quality and safety standards." See Principal Dissent at 31, 33, 35.)15

_____

15. We also disagree with Judge Rendell's view that Section 30(A) manifests an intent to benefit providers simply because it says that a state plan must provide methods and procedures "relating to the utilization of, and payment for, care and services available under the plan."

First, Judge Rendell's analysis looks at only part of Section 30(A), but we do not think that it is possible to determine whether Section 30(A)

14

In attempting to point out what we view as the critical differences between the Boren Amendment and Section 30(A), we do not dispute the obvious point that these provisions have other features in common, as the principal dissent points out. For instance, the principal dissent is correct in noting that "[b]oth the Boren Amendment and Section 30(A) require states to reimburse providers for

_____

was intended to benefit providers or just recipients without looking at the entire provision. Moreover, although Judge Rendell would look at only one part of Section 30(A) in determining whether that provision was intended to benefit providers, we assume that she would look at the rest of the provision in determining whether Section 30(A) meets the next requirement set out in Wilder and Blessing, viz., that the right allegedly protected by the statute must not be so "vague and amorphous" that its enforcement would strain judicial competence. Blessing, 520 U.S. at 340-41; Wilder, 496 U.S. at 509. If she did not do so -- if she confined her analysis of this question to the portion of the statute that she examines in relation to the intent-to-benefit issue-- she would have to conclude that this second requirement cannot be met. If Section 30(A) simply said that a state plan must "provide . . . methods and procedures relating to the utilization of, and the payment for, care and services available under the plan," it would not set out a standard that a court could enforce. The substance of what a state plan must meet is set out in the portion of Section 30(A) that follows, and this part of the provision
cannot be ignored. We see no justification for examining only one part of a statute in considering the intent-to-benefit issue and then considering other parts of the statute in considering other prongs of the Wilder/Blessing inquiry.

Second, if the mere reference to "payment" in the part of Section 30(A) that Judge Rendell examines were enough to show an intent to benefit providers, it would be virtually impossible to draft a provision requiring a state plan to provide services without creating an entitlement to sue on behalf of the providers who furnish those services. Providers, after all, must be paid, and according to Judge Rendell's position, if a statute makes any mention of "payment," it evidences an intent to benefit providers. It is interesting to apply Judge Rendell's analysis to the current version of 42 U.S.C. S 1396a(a)(13), which replaced the Boren Amendment. One of Congress's main objectives -- perhaps its dominant objective -- in repealing the Boren Amendment was to take away the right to sue under S 1983, but the provision that replaced the Boren Amendment, refers to the "determination of rates of payment under the [state] plan" and goes on to refer repeatedly to "rates."

15

services rendered." Principal Dissent at 32. But as we began by cautioning, the inquiry mandated by Wilder and Blessing – whether Congress intended for Section 30(A) to benefit providers as opposed to simply knowing that providers would be benefitted –- calls for us to draw a fine line and to take into account the precise statutory language adopted by Congress. After considering the language of the Boren Amendment and Section 30(A), we remain convinced that there are critical differences and that Section 30(A), unlike the Boren Amendment, was not intended to benefit providers.

C.

We have examined the legislative history of Section 30(A) and have found nothing inconsistent with our reading of the statutory language. The plaintiffs note that when Section 30(A) was originally enacted in 1967, see Social Security Amendments of 1967, Pub. L. 90–248, S 237, 81 Stat. 821, 911 (1968), it differed in two respects from the current version: it required a state plan to assure that payments were "not in excess of reasonable charges," and it lacked the adequate access requirement that the current version contains.[16] In 1981, Congress changed these features.

Nothing in the 1981 amendments suggests that the current version of the statute is intended to benefit providers. On the contrary, the effect of the 1981

_____

16. As enacted in 1967, it required a state to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments .. . are not in excess of reasonable charges consistent with efficiency, economy, and quality of care.

This provision originated as a Senate Amendment to the House bill, and the brief discussion of this provision in the Conference Committee report says nothing that has a bearing on the issue before us. See Conf. Rep. No. 1030, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.C.C.A.N. 3179, 3213 (1967).

16

amendments was to sharpen the focus on Medicaid beneficiaries. Language referring to providers' charges was removed, and language providing a further protection for beneficiaries was added.

The plaintiffs note, however, that the House Committee Report on the 1981 amendments observed that "in instances where the States or the Secretary fail to observe these statutory requirements, the courts would be expected to take appropriate remedial action." H.R. Rep. No. 158, 97th Cong., 312-13 (1981). This statement certainly suggests that the Committee anticipated that some class of plaintiffs would be able to sue to enforce Section 30(A), but it does not show that the Committee anticipated that Medicaid providers, as opposed to recipients, would be able to do so. It is thus of little value for present purposes.

The plaintiffs rely, finally, on certain HHS regulations that the plaintiffs view as showing that HHS has interpreted Section 30(A) as intended to benefit providers. We have examined these regulations, and we do not believe that they evidence any such interpretation. The most pertinent of the current regulations cited by the plaintiffs establish upper limits on what a state program may pay for drugs. See 42 C.F.R. SS 447.301, 447.331- .334 (2001). Section 447.331(b), which applies to brand name drugs duly certified by a physician to be medically necessary for a particular recipient, is illustrative. This provision states that a state agency's payments for such drugs

> must not exceed in the aggregate, payment levels that the agency has determined by applying the lower of the --

> (1)Estimate acquisition costs plus reasonable dispensing fees established by the agency; or

> (2)Providers' usual and customary charges to the general public

These regulations do not assist the plaintiffs here for the obvious reason that they merely set a ceiling, but no floor, on what providers must be paid. Any payments below the ceiling, no matter how low, would satisfy the regulation. Accordingly, the regulations do not show that the Secretary

17

has interpreted Section 30(A) as intended to benefit providers; nor can they be viewed as themselves intended to benefit providers.17

In sum, we are convinced that Section 30(A) is not intended to benefit providers and that therefore providers may not assert a Section 30(A) claim under S 1983.

D.

Of the other courts of appeals that have considered the question whether providers may assert a Section 30(A) claim under S 1983, the Fifth Circuit's opinion contains the most thorough analysis of the intended-to-benefit requirement. See Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908, 928-29 (5th Cir. 2000); see also Walgreen Co. v. Hood, 275 F.3d 475 (5th Cir. 2001). In Evergreen Presbyterian Ministries, the Fifth Circuit wrote:

> Section 30(A) . . . focuses on recipients in that it is directly keyed to the recipients' access to medical care, and as a result, the recipients are the direct intended beneficiaries of the section. . . . [I]n contrast to the Boren Amendment, section 30(A) does not create an individual entitlement in favor of any provider. The section benefits recipients by ensuring there is an adequate number of providers in the marketplace. Therefore, it may be true that health care providers as a group are indirectly benefitted by section 30(A) because the section requires that the payments to providers be sufficient to ensure that Medicaid recipients have equal access to medical care. But it cannot be said that section 30(A) necessarily confers upon each provider an individual right to a particular payment because the section does not focus directly on providers.

235 F.3d at 928-29 (emphasis in the original). We agree with the Fifth Circuit's analysis and holding.

_____

17. In South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot., 274 F.3d 771 (3d Cir. 2001), we held that a regulation may invoke a private right of action that Congress created through statutory text but may not create a new right.

18

Prior to the decision in Evergreen Presbyterian Ministries, the First, Seventh, and Eighth Circuits had held that providers may pursue a Section 30(A) action underS 1983, but we decline to follow these decisions. See Visiting Nurse Ass'n of North Shore, Inc. v. Bullen, 93 F.3d 997, 1004 (1st Cir. 1996); Methodist Hosp., Inc. v. Sullivan , 91 F.3d 1026, 1029 (7th Cir. 1996); Arkansas Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 526 (8th Cir. 1993).18

In Arkansas Medical Society, the Eighth Circuit reasoned as follows:

> The question of whether the Medicaid providers are intended beneficiaries is . . . easily resolved. Wilder concluded that institutional providers were intended beneficiaries of the Boren Amendment because the Amendment concerned their reimbursement. Wilder, 496 U.S. at 510, 110 S.Ct. at 2517. Similarly, the equal access provision [of Section 30(A)] addresses payment for "care and services" provided by noninstitutional providers. The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries.

6 F.3d at 526 (emphasis added).

This analysis pays little attention to the differing terms of the Boren Amendment and Section 30(A) and is thus inconsistent with the reminder in Suter to examine each particular statutory provision "in detail." 503 U.S. at 357. Arkansas Medical Society fails to note that the Boren Amendment was keyed to providers' costs, whereas Section 30(A) focuses on the care and services available to recipients. Moreover, while Arkansas Medical Society read Wilder to mean that the Boren Amendment was intended to benefit providers simply because it "concerned their reimbursement," 6 F.3d at 526, Wilder actually relied on the fact that the Boren Amendment "establishe[d] a system

_____

18. In Orthopaedic Hosp. v. Belshe, 103 F.3d 1491 (9th Cir. 1997), the Court held in favor of a hospital that appealed an adverse decision regarding a Section 30(A) claim brought under S 1983. However, the Court's opinion provides no indication that the hospital's right to proceed
under S 1983 was challenged, and the Court did not address the issue.

for reimbursement of providers and [was] phrased in terms benefitting health care providers." Wilder, 496 U.S. at 510 (emphasis added). As we have noted, the same cannot be said of Section 30(A).

In Methodist Hosp., Inc. v. Sullivan, supra, the Seventh Circuit held that Medicaid providers may assert Section 30(A) claims under S 1983, but the opinion provides no indication that the Seventh Circuit was presented with the question whether Section 30(A) was intended to benefit providers. Instead, the opinion merely addresses-- and rejects -- the district court's holding that providers could not sue under Section 30(A) because the term "geographic area"19 is so "vague and amorphous" that its enforcement would strain judicial competence. Methodist Hosp. v. Indiana Family and Social Services Admin., 860 F. Supp. 1309, 1331- 33 (N.D. In. 1994).

In Visiting Nurse Ass'n of North Shore, Inc. v. Bullen, supra, the argument presented to the First Circuit regarding the intended-to-benefit requirement was notably different from the argument presented to us. In Visiting Nurse Ass'n, it was argued that Section 30(A), unlike the Boren Amendment, is not intended to benefit providers because Section 30(A) "does not list specific categories of health care providers (e.g., hospitals, nursing facilities, and intermediate care facilities." 93 F.3d at 1004. The First Circuit rejected this attempted distinction and wrote:

> The Wilder Court first observed that the statute "is phrased in terms benefitting health care providers," and leaves "little doubt that health care providers are the intended beneficiaries," then proceeded to illustrate how the plain language of the Boren Amendment "establishes a system for reimbursement of providers" through its listing of specific types of health care providers. Nowhere did the Court indicate that the more general term "providers" would not suffice, however, or that a listing of specific types of providers

_____

19. As previously noted, Section 30(A) requires that a plan assure that "care and services are available under the plan at least to the extent that
such care and services are available to the general population in the geographic area." 42 U.S.C. S 1396a (30)(A)(emphasis added).

20

is a sine qua non without which a congressional intent to benefit health care providers could not be inferred. As long as the two statutory provisions evince a congressional concern for preserving financial incentives to providers––by ensuring adequate reimbursement payment levels––providers are appropriately considered intended beneficiaries. See Arkansas Med. Soc'y, Inc., 6 F.3d at 526.

93 F.3d at 1004 (italics in quotations from Wilder added by First Circuit). To the extent that the First Circuit rejected the particular argument advanced to it, its decision has no bearing on the issue we address here. And to the extent that the First Circuit simply adopted the reasoning of Arkansas Medical Society, we find that reasoning unpersuasive for the reasons already explained.

After considering all of the decisions of other courts of appeals on the question before us, we agree with the Fifth Circuit's analysis in Evergreen Presbyterian Ministries, and we respectfully decline to follow the contrary courts of appeals decisions.

E.

Our conclusion that providers may not assert Section 30(A) claims under S 1983 does not mean that Section 30(A)'s important "quality of care" and access requirements will go unenforced. Not only is HHS responsible for ensuring that state plans are administered in accordance with these requirements, see 42 U.S.C. S 1396c, but Medicaid recipients plainly satisfy the intended–to–benefit requirement and are thus potential private plaintiffs. In other parts of the country, recipients have sued to enforce Section 30(A), and the other courts of appeals have uniformly held that recipients may assert such claims under S 1983. See Evergreen Presbyterian Ministries, 235 F.3d at 927; Visiting Nurses Ass'n, 93 F.3d at 1004 n.7; Arkansas Medical Society, 6 F.3d at 526. If, as the plaintiffs in this case allege, the rates set under the HealthChoices program are so low that compliance with the "quality of care" and access requirements is threatened, we see no reason to believe that recipients in the affected area of the

21

Commonwealth will not seek legal redress to ensure that these critical mandates are met.

IV.

For the reasons explained above, the order of the District Court is affirmed.

22

BECKER, Chief Judge, dissenting, with whom Judges
Mansmann,* Scirica, McKee and Rendell join.

The focus of the majority opinion, quite properly, is on
whether Section 30(A) is intended to benefit the provider
plaintiffs. To reach the result that it was not, the majority
must distinguish the case central to the outcome, Wilder v.
Virginia Hospital Association, 496 U.S. 498 (1990), which
held that the Boren Amendment, a statute that by its
express terms required states to establish a scheme for
reimbursement of Medicaid healthcare providers, is
intended to benefit providers. The majority attempts to do
so by reasoning that the Boren Amendment and Section
30(A) "contrast[ ] sharply." Maj. Op. at 11. I disagree, for as
I will explain, the two statutes confer nearly identical rights
on providers. Hence this case is squarely controlled by
Wilder, which compels the conclusion that healthcare
providers may sue under S 1983 to enforce their rights
under Section 30(A). The clear majority of Circuits to
address the question whether healthcare providers may sue
under S 1983 to enforce their rights under Section 30(A)
have resolved that question in the affirmative, and my views
are in accord.

As the majority observes, the Boren Amendment and
Section 30(A) differ textually insofar as the Boren
Amendment's reference to provider costs in its definition of
reimbursement rates is absent from Section 30(A). The
rationale of Wilder, however, renders this difference
immaterial, since Wilder nowhere relied on the Boren
Amendment's reference to provider costs in concluding that
providers were intended beneficiaries of that statute.
Rather, Wilder clearly explained that the reason providers
were intended beneficiaries of the Boren Amendment is that
the provision by its express terms required states to
establish a scheme for provider reimbursement. See Wilder,
496 U.S. at 510. Similarly, Section 30(A) expressly requires
states to establish a system for reimbursing providers for
services rendered.

_____

* The Honorable Carol Los Mansmann participated in the oral argument
and joined in this opinion, but died before the opinion could be filed.

23

Much of the majority opinion is devoted to explaining why Medicaid recipients are among the intended beneficiaries of Section 30(A). I agree, but a statute can have more than one class of intended beneficiaries and hence the mere fact that Congress intended Section 30(A) to benefit Medicaid recipients has no bearing on whether Congress also intended Section 30(A) to benefit Medicaid providers. By its own terms, Section 30(A) is addressed to both healthcare providers and Medicaid recipients, for, like the Boren Amendment, it expressly requires states to establish a scheme for provider reimbursement and mandates minimum reimbursement rates defined by reference to quality of care and recipients' access to care and services. Hence, Wilder controls.

While this brief introduction sets up the analytical core of this opinion, it is deficient to the extent that it lacks context -- the dynamic of the real world of healthcare. Unfortunately, so does the majority opinion, which, while commendably terse, is short on "realpolitik." I will therefore supply that broader context, which implicates the relationship between provider costs and the availability of services to Medicaid recipients. The background of this case is the recent change in the Medicaid system in the five-county Philadelphia metropolitan area from fee-for-service to managed care. The plaintiffs have adduced evidence designed to demonstrate that the HMOs, in administering Medicaid, have squeezed the pharmacies and reduced provider reimbursement rates to levels that, according to the plaintiffs, are below any reasonable measure of the cost of providing care and services. As a practical matter, if the HMOs set provider reimbursement rates too low, providers will simply refuse to render services to Medicaid recipients, and recipients will go without adequate access. In fact, 50% of the pharmacies that participated in Medicaid in the five county area have dropped out since 1997. The plaintiffs also produced evidence that no pharmacy within fifteen contiguous zip codes in Bucks and Montgomery counties participates in Medicaid, and that among those pharmacies in the five-county area that continue to participate in Medicaid, quality of care has suffered as a result of inadequate reimbursement rates.

24

While the plaintiffs' submissions in this area are contested, and failure to establish that the challenged reimbursement rates violate Section 30(A)'s quality of care and adequate access mandates would be fatal to their case, they demonstrate a nexus between the interests of providers and the interests of recipients, which is recognized by the express terms of Section 30(A). Moreover, given the financial straits of Medicaid recipients and providers' access to information on the relationship between reimbursement rates and provider participation in Medicaid, healthcare providers may be better able to enforce recipients' and providers' shared interest in assuring that provider reimbursement rates comply with the mandates of Section 30(A).

I thus respectfully dissent from the conclusion that S 1983 does not grant providers a cause of action to sue for violations of Section 30(A). Since the Court has not gone beyond the threshold issue of whether S 1983 grants providers a right of action to enforce Section 30(A), I would reconstitute the original panel so that it may resolve the merits of the Department's summary judgment motion, which requires determining whether plaintiffs have produced sufficient evidence for a reasonable jury to find that the challenged reimbursement rates violate Section 30(A)'s quality of care and adequate access mandates, an issue on which I express no opinion.

I.

The managed care program at issue is HealthChoices, under which the Pennsylvania Department of Public Welfare has contracted with four HMOs to administer the Medicaid program in the five-county area. The Department agrees to pay the HMOs on a per-person basis, and permits the HMOs to set pharmacy reimbursement rates. The plaintiffs allege that the pharmacy reimbursement rates set by the HMOs are below any reasonable estimate of pharmacies' costs, and that unless rates are at least adequate to cover providers' costs, they cannot be consistent with quality of care or sufficient to induce enough pharmacies to participate in Medicaid so that Medicaid recipients have the same access to pharmacies as

25

members of the general population, as is required by Section 30(A).

In support of their claim that current rates are inconsistent with quality of care, the plaintiff pharmacists produced evidence that: (1) low reimbursement rates prevent them from dispensing or stocking certain drugs; (2) low reimbursement rates require them to cut back on services provided to customers, such as counseling customers about how to use their medication; (3) administrative problems with the HealthChoices HMOs prevent their customers from obtaining medication; (4) HealthChoices HMOs force their customers to change repeatedly their medication, causing delays and leading to health problems when the new medication is ineffective; (5) HealthChoices HMOs restrict the formularies that may be used to fill customer prescriptions, causing delays in customers' prescriptions being filled, often to the detriment of customers' health; and (6) HealthChoices HMOs make medical judgments on a daily basis over the phone and deny medications that they know nothing about.

In support of their allegation that the reimbursement rates fall below the minimum rates mandated by Section 30(A)'s access requirement, plaintiffs produced evidence showing a precipitous drop in the number of pharmacies in the five-county area who participate in Medicaid since the inception of HealthChoices. In particular, 50% of the pharmacies that participated in Medicaid have dropped out since 1997. Plaintiffs also produced evidence that the HealthChoices reimbursement rates are the lowest rates in the five-county area, and that whereas the Blue Cross network has 963 participating pharmacies in the five-county area, the four HealthChoices HMOs have only 600, 635, 794, and 864 pharmacies each participating in their networks. Moreover, there are no pharmacies that participate in Medicaid in fifteen contiguous zip codes in Bucks and Montgomery counties. Consequently, according to the plaintiffs, Medicaid recipients lack access to pharmacies to the same extent as the general population.

Whether this evidence is sufficient to create a triable issue of fact as to whether the current rates violate Section 30(A)'s quality of care and adequate access mandate is, of

26

course, disputed by the Department. My purpose in summarizing this evidence is not to express a view as to whether this evidence is sufficient for plaintiffs' claims to survive summary judgment, but rather to provide concrete evidence of the common interest shared by providers and recipients in enforcing the provider reimbursement rates mandated by Section 30(A).

On its face Section 30(A) is addressed to both healthcare providers and Medicaid recipients, as it expressly requires states to establish a scheme for provider reimbursement and mandates minimum reimbursement rates defined by reference to recipients' quality of care and access to care and services. In particular, Section 30(A) requires states to "provide . . . methods and procedures relating to. . . the payment for[ ] care and services available under the plan" and to reimburse providers at rates that are "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."

The House Report on the 1989 amendment to Section 30(A) confirms Congress's recognition that because healthcare providers' participation in Medicaid is voluntary, Medicaid recipients' access to healthcare will suffer if provider reimbursement rates are too low to induce a sufficient number of providers to participate in Medicaid:

> There is no doubt that Medicaid reimbursement rates have not kept pace with average community rates. . ... The Committee believes that, without adequate payment levels, it is simply unrealistic to expect physicians to participate in the program. . . .[T]he Committee bill would require that Medicaid payments for all practitioners be sufficient to enlist enough providers so that care and service are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

H.R. Rep. No. 101–247, at 390 (1989), reprinted in 1989 U.S.C.C.A.N. 2060, 2116. As the majority notes, Section

27

30(A)'s legislative history also indicates that Congress intended Section 30(A) to be enforced through private actions. See H.R. Rep. No. 158, at 312-13 (1981) ("[I]n instances where the States or the Secretary fail to observe these statutory requirements, the courts would be expected to take appropriate remedial action.").

The evidence we have described illustrates the manner in which the interests of healthcare providers and Medicaid recipients are inextricably intertwined. As we noted in West Virginia University Hospitals, Inc. v. Casey, 885 F.2d 11 (3d Cir. 1989), aff 'd on other grounds, 499 U.S. 83 (1991):

> We recognize, of course, that the primary purpose of medicaid is to achieve the praiseworthy social objective of granting health care coverage to those who cannot afford it. It does not necessarily follow, however, that Title XIX grants substantive rights only to medicaid patients. Although the broad purpose of the Medicaid Act as a whole is to help the poor attain medical care, the specific purpose of section 1396a(a)(13)(A) is to assure state compliance with some federal standard of hospital reimbursement. The section sets up a plan for the adequate and reasonable reimbursement of hospitals which serve medicaid patients, and thus hospitals are the section's "beneficiaries." Their interests and the interests of medicaid patients are bonded by a common goal, the delivery of adequate health care by the hospitals to state medicaid patients and the enjoyment of such care by the patients. The interests of both are intertwined and hospitals have a concrete stake in reimbursement in accordance with the federal statute and regulations.

Id. at 20. Against this backdrop, I now turn to the doctrinal question whether S 1983 grants healthcare providers a cause of action to enforce Section 30(A).

II.

Until now, nearly every Circuit to consider the issue has held that whether providers may bring actions under S 1983 to enforce the mandates of Section 30(A) is squarely controlled by the Supreme Court's decision in Wilder, which

of course remains binding on this Court unless the Supreme Court overrules it. See State Oil Co. v. Khan, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."). The first Court of Appeals to consider the issue was the Eighth Circuit in Arkansas Medical Society, Inc. v. Reynolds, 6 F.3d 519 (8th Cir. 1993), which concluded that Section 30(A) is indistinguishable from the Boren Amendment, which the Supreme Court in Wilder held was enforceable by providers under S 1983:

> Our analysis in this case is greatly simplified by the Wilder opinion. Although focusing on a different subsection, Wilder addressed the same statute facing us in this case. Suter urges a careful scrutiny of the exact legislation at issue and Wilder has already done that. . . . [T]he equal access provision is very analogous to the Boren Amendment examined in Wilder; they are similar not only in function but also in the specific language employed.

Id. at 525. With regard to the particular question whether providers are among the intended beneficiaries of Section 30(A), the Court determined that:

> The question of whether the Medicaid providers are intended beneficiaries is also easily resolved. Wilder concluded that institutional providers were intended beneficiaries of the Boren Amendment because the Amendment concerned their reimbursement. Similarly, the equal access provision [of Section 30(A)] addresses payment for "care and services" provided by noninstitutional providers. The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries.

Id. at 526 (internal citations omitted).

The First Circuit and the Seventh Circuit have also easily resolved the issue whether providers may bring S 1983 actions to enforce Section 30(A) by noting that the question is squarely controlled by Wilder. In Visiting Nurse Association of North Shore, Inc. v. Bullen, 93 F.3d 997 (1st Cir. 1996), the First Circuit concluded that providers are among the intended beneficiaries of Section 30(A) for the

29

same reason that the Supreme Court held that they were among the intended beneficiaries of the Boren Amendment:

>The Wilder Court first observed that the[Boren Amendment] "is phrased in terms benefitting health care providers," and leaves "little doubt that health care providers are the intended beneficiaries," then proceeded to illustrate how the plain language of the Boren Amendment "establishes a system for reimbursement of providers" . . . . As long as the two statutory provisions evince a congressional concern for preserving financial incentives to providers -- by ensuring adequate reimbursement payment levels -- providers are appropriately considered intended beneficiaries.

Id. at 1004 (emphasis and internal citations omitted). Similarly, the Seventh Circuit observed that because Wilder had not been overruled, "Wilder's holding binds us," and consequently held that providers have a private right of action under S 1983 to enforce Section 30(A). See Methodist Hosps., Inc. v. Sullivan, 91 F.3d 1026, 1029 (7th Cir. 1996) ("We therefore . . . hold that providers of medical care have a private right of action, derived through S 1983, to enforce S 1396a(a)(30)."). Thus, most courts have found that whether S 1983 grants providers a cause of action to enforce Section 30(A) is an issue that is easily disposed of by Wilder. Until now, the only Circuit to hold otherwise is the Fifth Circuit in Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908 (5th Cir. 2000), which I discuss in Section IV, infra.

III.

A.

The majority holds that providers may not sue under S 1983 to enforce Section 30(A) because they are not among the provision's intended beneficiaries.1  Like most Courts of

_____

1. I disagree with the majority's replacement of the requirement under S 1983 that "Congress must have intended that the provision in question

30

Appeals to consider the issue, I believe that the inquiry into
whether providers are among the intended beneficiaries of
Section 30(A) begins and ends with Wilder.

The Boren Amendment, which was the statute that
providers sought to enforce in Wilder, provided, in relevant
part:

> A State plan for medical assistance must . . . provide
> . . . for payment . . . of hospital services, nursing
> facilities, and services in an intermediate care facility
> for the mentally retarded provided under the plan
> through the use of rates . . . which the State finds. . .
> are reasonable and adequate to meet the costs which
> must be incurred by efficiently and economically
> operated facilities in order to provide care and services
> in conformity with applicable State and Federal laws,
> regulations, and quality and safety standards and to
> assure that individuals eligible for medical assistance

_____

benefit the plaintiff," Blessing v. Freestone , 520 U.S. 329, 340 (1997),
with the stricter requirement, drawn from an implied right of action case,
that the statute must be "draft[ed] . . . with an unmistakable focus on
the benefitted class." Cannon v. Univ. of Chi., 441 U.S. 677, 691 (1979).
See Maj. Op. at 9, 11. The Supreme Court has made clear that:

> [Whether a cause of action exists under S 1983] is a different
inquiry
> than that involved in determining whether a private right of action
> can be implied from a particular statute. In implied right of
action
> cases, we employ the four-factor Cort test to determine whether
> Congress intended to create the private remedy asserted for the
> violation of statutory rights. The test reflects a concern,
grounded in
> separation of powers, that Congress rather than the courts controls
> the availability of remedies for violations of statutes. Because S
1983
> provides an alternative source of express congressional
> authorization of private suits, these separation-of-powers concerns
> are not present in a S 1983 case.

Wilder, 496 U.S. at 508 n.9 (internal quotations and citations omitted).
The Supreme Court has never held that to be enforceable under S 1983,
a provision must also be "draft[ed] . . . with an unmistakable focus on
the benefitted class," Cannon, 441 U.S. at 692, as the majority asserts.
Rather, in the S 1983 context, a plaintiff must simply show that the
provision in question was "intended to benefit" the plaintiff. Golden
State
Transit Corp. v. City of L.A., 493 U.S. 103, 106 (1989).

        have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality . . . .

42 U.S.C. S 1396a(a)(13)(A) (repealed).

The text of Section 30(A) is strikingly similar. It provides, in relevant part:

        A State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C. S 1396a(a)(30)(A). Comparing the two statutes, I can find no principled basis for holding that providers are intended beneficiaries of the Boren Amendment, as the Supreme Court held in Wilder, but are not intended beneficiaries of Section 30(A), as the majority holds today. In particular, I cannot accept the majority's contention that "[t]he language of Section 30(A) contrasts sharply with that of the Boren Amendment." Maj. Op. at 11.

Both the Boren Amendment and Section 30(A) require states to reimburse providers for services rendered. See Boren Amendment ("A State plan for medical assistance must . . . provide . . . for payment . . . of . . . services . . . provided under the plan . . . ."); Section 30(A) ("A State plan for medical assistance must . . . provide . . . methods and procedures relating to . . . payment for, care and services available under the plan . . . ."). And both the Boren Amendment and Section 30(A) define reimbursement rates by reference to efficiency and economy. See Boren Amendment (defining rates by reference to "efficiently and economically operated facilities"); Section 30(A) (requiring states "to assure that payments are consistent with efficiency [and] economy").

32

Both the Boren Amendment and Section 30(A) require states to reimburse providers at rates that are sufficient to ensure quality of care. See Boren Amendment (requiring that reimbursement rates be "reasonable and adequate to meet the costs which must be incurred . . . in order to provide care and services in conformity with . . . quality and safety standards"); Section 30(A) (requiring states "to assure that payments are consistent with . . . quality of care"). And both the Boren Amendment and Section 30(A) require states to reimburse providers at rates that are sufficient to guarantee Medicaid recipients adequate access to healthcare. See Boren Amendment (requiring "rates . . . which . . . are reasonable and adequate . . . to assure that individuals eligible for medical assistance have reasonable access . . . to inpatient hospital services"); Section 30(A) (requiring states "to assure that payments are . . . sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area").

Thus, far from "contrast[ing] sharply," as the majority contends, see Maj. Op. at 11, the Boren Amendment and Section 30(A) confer on providers nearly identical rights to be reimbursed for services provided and to be reimbursed at a minimum rate that is defined by reference to quality of care and adequate access. See Ark. Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 525 (8th Cir. 1993) ("[T]he equal access provision [of Section 30(A)] is very analogous to the Boren Amendment examined in Wilder; they are similar not only in function but also in the specific language employed."). This case is therefore squarely controlled by Wilder, and I would hold that healthcare providers may bring S 1983 actions to enforce the rights conferred on them by Section 30(A).2

_____

2. I fully concur in the majority's distinction between "the question whether a statute is intended to benefit particular plaintiffs" and "the question whether the statute in fact benefits those plaintiffs." Maj. Op. at 8. Similarly, I agree with the majority's observation that "lessors of pharmacy premises, cleaning service firms retained by pharmacies, trash collection companies retained by pharmacies, [and] private security firms retained by pharmacies" may all benefit from Section 30(A). Maj. Op. at

33

B.

The majority's rationale relies heavily on the fact that Section 30(A) is addressed in part to recipients, since it defines provider reimbursement rates by reference to quality of care and adequate access. See Maj. Op. at 11 ("[Section 30(A)'s] directives to provide`quality of care' and adequate access . . . . are drafted with an unmistakable focus on Medicaid beneficiaries, not providers."); id. at 12 ("[Section 30(A)] demands that payments be set at levels that are sufficient to meet recipients' needs."); id. ("[T]he adequacy of payments [under Section 30(A)] is measured in relation to the health needs of recipients."); id. at 19 ("Section 30(A) focuses on the care and services available to recipients."); id. at 12 ("It is therefore apparent from the statutory language that the intended beneficiaries of Section 30(A) are recipients, not providers.").

To rely on the quality of care and adequate access guarantees as a basis for holding that Section 30(A) was not intended to benefit providers, however, would require overruling Wilder, which squarely held that a statute that defines provider reimbursement rates by reference to Medicaid recipients' quality of care and Medicaid recipients' access to care and services may nonetheless be intended to benefit providers. Nowhere in Wilder did either the majority or the dissent even hint that the Boren Amendment's reference to quality of care and adequate access should give the Court pause before concluding that the Boren Amendment was intended to benefit providers. As such, for purposes of determining whether providers are intended beneficiaries of Section 30(A), Wilder renders irrelevant the fact that Section 30(A) includes quality of care and adequate access guarantees.

Inexplicably, then, the majority makes the adequate access and quality of care guarantees that are found in

_____

8. But I have little difficulty in concluding that these third parties are not among the intended beneficiaries of Section 30(A), for the simple reason that Section 30(A) expressly requires states to establish a scheme for reimbursing those who provide healthcare services, not garbage collection services or security services.

34

both the Boren Amendment and Section 30(A) the cornerstone of its analysis in holding that providers are not intended beneficiaries of Section 30(A). To be consistent with Wilder, which held that providers are intended beneficiaries of the Boren Amendment, however, a rationale leading to the conclusion that providers are not  intended beneficiaries of Section 30(A) must rest not on similarities between the Boren Amendment and Section 30(A), as does the vast bulk of the majority opinion, but rather on differences.

C.

The only difference between the Boren Amendment and Section 30(A) that the majority relies on is the Boren Amendment's reference to providers' costs, which is absent from Section 30(A). For the reasons discussed below, however, the reference to providers' costs in the Boren Amendment and the absence of such a reference in Section 30(A) are immaterial for purposes of determining whether providers are among the intended beneficiaries of Section 30(A).

First, the language of the Boren Amendment did not create any independent right on the part of providers to be reimbursed for their costs without reference to quality of care, as the majority maintains. The majority repeatedly quotes the language in the Boren Amendment requiring payments to be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," Maj. Op. at 10, 11, but neglects to quote the remainder of the clause, which goes on to expressly define costs in terms of quality of care. In fact, the Boren Amendment required payment for "the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards ." (emphases added). The plain language of the Boren Amendment thus explicitly defined "costs" by reference to quality of care, and created no independent right of providers to be reimbursed for their costs beyond that conferred by the quality of care requirement, such as exists in Section 30(A).

35

I acknowledge that quality of care guarantees in the two statutes are not completely identical -- the Boren Amendment requires rates that "meet the costs which must be incurred . . . to provide care and services in conformity with . . . quality and safety standards," while Section 30(A) requires rates that "are consistent with . . . quality of care." I cannot agree with the majority's conclusion, however, that this difference is so significant that quality of care "played a decidedly secondary role in the Boren Amendment," but "is a primary benchmark" in Section 30(A). Maj. Op. at 14. Indeed, the majority never explains how a reimbursement rate could be so low that it violates the Boren Amendment's requirement that rates meet "the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards," yet nonetheless be "consistent with . . . quality of care," as mandated by Section 30(A).

Even assuming, arguendo, that the majority is correct that the Boren Amendment created an independent right on the part of providers to be reimbursed for their costs without reference to quality of care, the plaintiffs in Wilder were suing to enforce both their right to be reimbursed at rates that covered their costs, as well as their independent right under the Boren Amendment to be reimbursed at rates that are sufficient to ensure adequate access. See Wilder, 496 U.S. at 503 ("Respondent contends that Virginia's Plan for reimbursement violates the Act because the rates are not reasonable and adequate to meet the economically and efficiently incurred cost of providing care to Medicaid patients in hospitals and do not assure access to inpatient care.") (emphasis added and internal quotation marks omitted). Had Wilder's holding rested on the Boren Amendment's reference to provider costs, as the majority contends, then the Court would have permitted the providers to sue under S 1983 to enforce only their right to be reimbursed for their costs, and not their additional right under the Boren Amendment to be reimbursed at rates sufficient to ensure recipients adequate access to care and services.

The plain language of S 1983 creates a cause of action not for a violation of a statute as an undifferentiated whole,

36

but rather for a violation of a "right[ ] . . . secured by the Constitution or laws" of the United States. See Blessing v. Freestone, 520 U.S. 329, 340 (1997) ("In order to seek redress through S 1983, . . . a plaintiff must assert the violation of a federal right, not merely a violation of federal law."); id. at 342 ("It was incumbent upon the respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined`rights.' "). By permitting the providers' suit to proceed, the Supreme Court necessarily held that providers are among the intended beneficiaries of not only the Boren Amendment's requirement that reimbursement rates be sufficient to cover provider costs, but also the Boren Amendment's requirement that reimbursement rates be sufficient to ensure recipients' adequate access to care and services.

Finally, and most importantly, the Supreme Court's rationale in Wilder made clear that in concluding that providers were intended beneficiaries of Section 30(A), it was relying not on the Boren Amendment's reference to providers' costs, as the majority asserts, but rather on the Boren Amendment's express requirement that states establish a scheme to reimburse providers for services rendered. In attempting to distinguish Section 30(A) from the Boren Amendment, the majority repeatedly quotes Wilder's conclusion that the Boren Amendment"was phrased in terms benefitting health care providers," see Maj. Op. at 10, 12, 20, but conspicuously omits the rest of the sentence, in which the Wilder Court explained why it concluded that the Boren Amendment "was phrased in terms benefitting health care providers." The remainder of the sentence, which the majority never fully quotes, makes clear what particular statutory language in the Boren Amendment the Court in Wilder was in fact relying on in concluding that the Boren Amendment was "phrased in terms benefitting providers":

> There can be little doubt that health care providers are
> the intended beneficiaries of the Boren Amendment.
> The provision establishes a system for reimbursement
> of providers and is phrased in terms benefitting health
> care providers: It requires a state plan to provide for

37

> "payment of the hospital services, nursing facility
> services, and services in an intermediate care facility for
> the mentally retarded provided under the plan."  42
> U.S.C. S 1396a(a)(13)(A) (1982 ed., Supp. V)

Wilder, 496 U.S. at 510 (internal alterations omitted)
(emphasis added).

The majority is "convinced," Maj. Op. at 12, that when
the Wilder Court stated that the Boren Amendment "is
phrased in terms benefitting health care providers: It
requires a state plan to provide for `payment of the hospital
services, nursing facility services, and services in an
intermediate care facility for the mentally retarded provided
under the plan,' " the Court was relying on language in the
Boren Amendment other than the language it directly
quoted. It is difficult to imagine how a judicial opinion
could be more clear about what particular statutory
language it is relying on to establish a given proposition
than by expressly quoting that language immediately
following the proposition, as the Supreme Court did in
Wilder. The majority's conclusion that the Court quoted
only a portion of the statutory language that it relied on in
concluding that the Boren Amendment was "phrased in
terms benefitting health care providers" is particularly
puzzling given that, according to the majority, that portion
of the Boren Amendment that the Court actually  quoted in
the passage above was insufficient to establish the
proposition for which it was cited, while that portion of the
Boren Amendment that the Court neglected to quote (the
Boren Amendment's reference to provider costs) was,
according to the majority, "plainly a boon for providers,"
and "an unmistakable sign of a congressional desire to
benefit providers." Maj. Op. at 14.

Indeed, by the majority's reasoning, it is hard to see why
the Wilder majority, in concluding the Boren Amendment
was "phrased in terms benefitting health care providers,"
would even bother to quote the particular language in the
Boren Amendment requiring "payment of the hospital
services, nursing facility services, and services in an
intermediate care facility for the mentally retarded provided
under the plan," given that, according to the majority, the
nearly identical language in Section 30(A) requiring

38

"payment for[ ] care and services available under the plan,"
"manifests concern solely for the well-being of recipients."
Maj. Op. at 12 (emphasis added).3

_____

3. The majority attempts to overcome the obvious difficulty posed by the
Wilder Court's quotation of the particular language in the Boren
Amendment that it was relying on by invoking the canon of construction
that a statute should be construed to avoid rendering any part of it
superfluous. According to the majority, if the reason that Wilder
concluded that the Boren Amendment was "phrased in terms benefitting
health care providers" was that it required a state plan to provide for
"payment of the hospital services, nursing facility services, and services
in an intermediate care facility for the mentally retarded provided under
the plan" (the language in the Boren Amendment that the Wilder
majority relied on), then the Supreme Court's "full [sic] sentence (`The
provision establishes a system for reimbursement of providers and is
phrased in terms benefitting health care providers') would say exactly the
same thing twice . . . ." Maj. Op. at 12.

I believe that this reasoning errs by "minutely parsing phrases, and
seeking shades of meaning in the interstices of sentences and words, as
though a discursive judicial opinion were a statute." Schlup v. Delo, 513
U.S. 298, 343 (1995) (Scalia, J., dissenting). Even if the majority were
correct that my reading of Wilder renders a portion of a sentence in the
opinion redundant, it would be neither the first nor the last time that a
judicial opinion sought clarity at risk of redundancy. Whatever
redundancy might exist in the sentence at issue in Wilder, I nonetheless
believe that the Court was relying on the statutory language that it
quoted when it stated that the Boren Amendment "is phrased in terms
benefitting health care providers: It requires a state plan to provide for
`payment of the hospital services, nursing facility services, and services
in an intermediate care facility for the mentally retarded provided under
the plan.' "

At all events, the Supreme Court's statement that the Boren
Amendment "establishes a system for reimbursement of providers" and
the Supreme Court's conclusion that the Boren Amendment "is phrased
in terms benefitting health care providers" because it "requires a state
plan to provide for `payment of the hospital services, nursing facility
services, and services in an intermediate care facility for the mentally
retarded provided under the plan' " do not amount to "say[ing] exactly
the same thing twice." Maj. Op. at 12. The first statement is addressed
to the substance of the Boren Amendment (the Boren Amendment
"establishes a system for reimbursement of providers," 496 U.S. at 510);
the second statement is addressed to the Boren Amendment's text (the
Boren Amendment "is phrased in terms benefitting health care providers:

39

Given that the excerpt quoted above contains the Wilder Court's entire discussion of whether providers were intended beneficiaries of the Boren Amendment, the majority is plainly incorrect when it asserts that"the Supreme Court [in Wilder] stressed the Boren Amendment's cost-reimbursement language," and that "the Court relied on language in the Boren Amendment that measured the adequacy of payments in relation to the economics of providers, i.e., their need to cover their reasonable costs." Maj. Op. at 10 (emphases added). Nowhere in its analysis did the Court rely on the Boren Amendment's reference to provider costs, much less "stress" such language, as the majority contends. And whatever this Court may think about the breadth of the Supreme Court's rationale, it is not our function to rewrite a Supreme Court opinion to narrow its holding by imputing to the Court reliance on a fact that played no role in the Court's rationale. Rather, the scope of the Wilder Court's holding must be determined by reference to the Wilder Court's ratio decidendi as articulated by the Wilder Court.

As is readily apparent from the analysis quoted above, the Wilder Court made perfectly clear that in concluding that "there can be little doubt that healthcare providers are the intended beneficiaries of the Boren Amendment," it was relying on the language in the Boren Amendment requiring a state plan to provide for "payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan." See Ark. Med. Soc'y, Inc. v. Reynolds , 6 F.3d 519, 526 (8th Cir. 1993) ("Wilder concluded that institutional providers were intended beneficiaries of the Boren

_____

It requires a state plan to provide for `payment of the hospital services, nursing facility services, and services in an intermediate care facility for
the mentally retarded provided under the plan.' " 496 U.S. at 510). See Maj. Op. at 9 (commenting on "the importance of the particular phrasing of a statute in this regard"); Maj. Op. at 16 ("[T]he inquiry mandated by Wilder and Blessing -- whether Congress intended for Section 30(A) to benefit providers as opposed to simply knowing  that providers would be benefitted -- calls for us . . . to take into account the precise statutory
language adopted by Congress.").

Amendment because the Amendment concerned their reimbursement."); see also Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908, 925 (5th Cir. 2000) ("[T]he [Wilder] Court concluded that there was little doubt that the providers were the intended beneficiaries of the Boren Amendment because it established a system for reimbursement of providers and was phrased in terms benefitting health care providers, in that it required a state plan to provide for their payment.") (internal quotations and alterations omitted); Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen, 93 F.3d 997, 1004 (1st Cir. 1996) ("The Wilder Court . . . observed that the statute `is phrased in terms benefitting health care providers,' and . . . then proceeded to illustrate how the plain language of the Boren Amendment `establishes a system for reimbursement of providers.' ") (emphasis omitted).

Thus, for the same reason that the Wilder Court concluded that the Boren Amendment was "phrased in terms benefitting health care providers: It requires a state plan to provide for `payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan,' " 496 U.S. at 510 (quoting the Boren Amendment), I would conclude that Section 30(A) is phrased in terms benefitting health care providers: It requires a state plan to provide for "payment for[ ] care and services available under the plan." See Ark. Med. Soc'y, 6 F.3d at 526 ("[T]he equal access provision [of Section 30(A)] addresses payment for `care and services' provided by noninstitutional providers. The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries."); Visiting Nurse Ass'n, 93 F.3d at 1004 (1st Cir. 1996) ("As long as the two statutory provisions evince a congressional concern for preserving financial incentives to providers-- by ensuring adequate reimbursement payment levels -- providers are appropriately considered intended beneficiaries.").4

(Text continued on page 43)

_____

4. One further point needs to be made -- that the majority's departure from Wilder creates serious line-drawing problems. Whereas Wilder held that any statute that expressly requires states to pay providers is

41

intended to benefit providers, the majority holds that whether such a statute is intended to benefit providers depends on how the statute defines the minimum payment rate. But the majority never offers an analytically sound explanation of how we are to distinguish those payment floors that are intended to benefit providers from those payment floors that are not.

At times, the majority appears to rely on the fact that the payment floor mandated by Section 30(A) is not expressly defined by reference to provider costs or provider economics. See Maj. Op. 12 (distinguishing Wilder on the ground that the Boren Amendment"measured the sufficiency of payments by reference to the economics of providers"); Id. at 12 ("Unlike the Boren Amendment, [Section 30(A)] evinces no direct concern for the economic situation of providers."). But if the majority's test of whether providers are intended beneficiaries of a statute requiring states to pay providers some minimum amount turns on whether the language of the statute expressly defines the minimum reimbursement rate by reference to provider costs or provider economics, then providers would not be among the intended beneficiaries of a statute that required states to pay pharmacies $2,500 each time they dispense a given dosage of a particular prescription drug, but would be among the intended beneficiaries of a statute that required states to pay providers 1% of their costs each time they dispensed a drug. In my view, this taxonomy is unreasonable.

Elsewhere, the majority appears to rely on the fact that the text of Section 30(A) defines the minimum reimbursement rates solely by reference to the health needs of recipients. See  Maj. Op. at 12 (observing that under Section 30(A), "the adequacy of payments is measured in relation to the health needs of recipients"). But if the majority's test of whether providers are intended beneficiaries of a statute requiring states to pay providers is whether the statute's language expressly defines reimbursement rates solely by reference to the health needs of recipients, then that test too, produces unreasonable results. Under such a test, providers would not be among the intended beneficiaries of a statute whose language expressly required states to pay providers ten times the rate needed to ensure Medicaid recipients quality of care and adequate access, but providers would be intended beneficiaries of a statute whose language expressly required states to pay providers a dollar every time they filled a Medicaid prescription.

Finally, it may be that the minimum reimbursement rates actually mandated by the Boren Amendment were lower than the actual minimum rates mandated by Section 30(A). For example, the Boren

42

In sum, although there are differences between the specific language of the Boren Amendment and the specific language of Section 30(A), as there inevitably will be between any two statutes, these differences are immaterial in light of Wilder's rationale, and the Supreme Court in Wilder gave no indication that its rationale was "good for this day and train only." County of Washington v. Gunther, 452 U.S. 161, 183 (1981) (Rehnquist, J., dissenting).

IV.

Until now, the only Court of Appeals to hold that providers may not bring S 1983 actions to enforce their rights under Section 30(A) was the Fifth Circuit in Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908 (5th Cir. 2000), which I would decline to follow. In holding that providers are not among the intended beneficiaries of Section 30(A), the Fifth Circuit in Evergreen relied heavily on the Supreme Court's decision in Blessing v. Freestone, 520 U.S. 329, 340 (1997), which held that a plaintiff may sue under S 1983 for a violation of a federal statute only if the statute creates an individual entitlement, and not simply a systemwide guarantee. Id. at 343. In Blessing, the plaintiffs were mothers whose children were eligible to receive child support services from the state pursuant to Title IV-D of the Social Security Act. Id. at 332. Plaintiffs brought a S 1983 action seeking to enforce 42

_____

Amendment's access requirement mandated that rates be sufficient to ensure only that "individuals eligible for medical assistance have reasonable access," whereas Section 30(A) requires equal access -- rates must be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." Fortunately, Wilder avoided the problem of distinguishing those mandatory payment floors that are intended to benefit the payee from those that are not. While how high the statute sets the payment floor will determine the magnitude of the intended benefit (a low minimum reimbursement rate obviously does not benefit providers as much as a high minimum reimbursement rate), under Wilder as long as the statute expressly requires states to pay providers, providers are intended beneficiaries.

43

U.S.C. S 609, which authorizes the Secretary of the Department of Health and Human Services to penalize a state if it is not in "substantial compliance" with Title IV-D. Id. at 335.

The Blessing Court held that S 609(a)(8) does not create an individual right, enforceable under S 1983, to have states achieve substantial compliance with Title IV-D. First, the Court noted that the plaintiffs had failed to identify a particular provision of Title IV-D that grants them an individual entitlement, and may not simply sue to enforce substantial compliance with Title IV-D as a whole. See Blessing, 520 U.S. at 342 ("It was incumbent upon respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined `rights.' "). Second, the Court reasoned that because S 609(a)(8)'s "substantial compliance" requirement would be satisfied if the state provided the mandated services in only 75% of the cases reviewed during the federal audit period, "even when a State is in `substantial compliance' with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet." Id. at 344. Thus, "[f]ar from creating an individual entitlement to services, the standard [which plaintiffs seek to enforce under S 1983] is simply a yardstick for the Secretary to measure the systemwide performance of a State's Title IV-D program." Id. at 343.

In view of the Supreme Court's rationale in Blessing, plaintiffs' claims in this case are easily distinguishable from plaintiffs' claims in Blessing. First, unlike the plaintiffs in Blessing, the plaintiffs in this case have identified with particularity the right claimed, since they allege that the reimbursement rates violate Section 30(A)'s quality of care and adequate access mandates. Cf. Blessing, 520 U.S. at 342 (distinguishing Wilder on the ground that "in Wilder, we held that health care providers had an enforceable right to reimbursement . . . as required by a particular provision in the Medicaid statute") (emphasis added). This case is therefore distinguishable from Blessing for the same reason that the Blessing Court concluded that Wilder was distinguishable from Blessing.

44

Blessing is further distinguishable on the ground that in that case, the plaintiffs would not necessarily have obtained any benefit had they succeeded on the merits of their claim, since the provision that they sought to enforce under S 1983 required only "substantial compliance" with Title IV-D. See Blessing, 520 U.S. at 344 ("[E]ven when a State is in `substantial compliance' with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet."). By contrast, in this case each individual plaintiff will necessarily benefit if they succeed on the merits, since they would each be individually entitled to reimbursement at higher rates.

I therefore disagree with Evergreen's reliance on Blessing in concluding that Section 30(A) creates only a system-wide guarantee, not an individual entitlement on the part of providers. The Fifth Circuit in Evergreen illustrated its reasoning with the following example:

> Assume we have a nursing home in Baton Rouge with 150 residents, which, following the [rate reduction at issue], is forced into bankruptcy and then liquidation. Assume further that the district court decides that the relevant geographic market to measure the access of recipients is the Baton Rouge market for nursing home care and also that the district court concludes that the recipients are entitled to the same access to nursing home care in Baton Rouge as that of non-Medicaid recipients. Finally, assume that, once the nursing home closes, all 150 residents are able to fill vacant beds in other facilities in Baton Rouge. Under this scenario, there is no violation of the recipients' equal access rights, despite the fact that the bankrupt nursing home was put out of business.
>
> From this example, it is apparent that while recipients have an individual entitlement to equal access to medical care, any benefit to healthcare providers is indirect at best. The statute does not confer any direct right upon the individual provider because, as the above example illustrates, even if an individual provider is forced to liquidate, the recipients' right to access is not necessarily violated.

45

235 F.3d at 929. I find this reasoning unpersuasive.

First, the Fifth Circuit put the rabbit in the hat when it reasoned from a hypothetical example in which Section 30(A) is not violated. See Evergreen, 235 F.3d at 929 ("Under this scenario, there is no violation of the recipients' equal access rights . . . ."). Of course providers will have no individual entitlement under Section 30(A) to increased reimbursement rates under a factual scenario in which Section 30(A) is not violated. But in a factual scenario where reimbursement rates are so low that Section 30(A)'s adequate access guarantee is violated, every provider who participates in Medicaid would be individually entitled to reimbursement at the higher rate mandated by Section 30(A).

Second, Evergreen incorrectly assumed that unless a statute requiring providers to be reimbursed at a given rate ensures that no providers will ever be put out of business, the statute does not create any direct right on the part of providers. See Evergreen, 235 F.3d at 929 ("The statute does not confer any direct right upon the individual provider because, as the above example illustrates, even if an individual provider is forced to liquidate, the recipients' right to access is not necessarily violated."). Under any statute addressed to provider reimbursement, however, it will almost always be the case that some providers may go out of business notwithstanding the statute. But this possibility does not mean that the statute creates no individual entitlement on the part of providers.

Consider, for example, a statute that expressly requires states to reimburse pharmacies at least $25 each time they dispense a given dosage of a particular prescription drug to a Medicaid recipient. A $25 reimbursement rate might force certain providers out of business, but it is hard to imagine a statute that more directly confers an individual entitlement on providers. Similarly, there was no guarantee in the Boren Amendment that no provider would ever be put out of business, but the Court in Wilder nonetheless held that the Boren Amendment conferred on providers rights that are enforceable under S 1983.

Finally, the Evergreen Court mistakenly reasoned that because the minimum reimbursement rate mandated by

46

Section 30(A) is defined by reference to the market-wide criterion of Medicaid recipients' access to healthcare, it does not confer an individual entitlement on providers. See Evergreen, 235 F.3d at 928 ("Section 30(A) does not create an individual entitlement in favor of any provider. The section benefits recipients by ensuring there is an adequate number of providers in the market place."). That Section 30(A) defines the mandatory minimum provider reimbursement rate by reference to the number of providers in the market place, however, does not make the rate any less mandatory or any less of a minimum. As long as a statute expressly requires providers to be reimbursed at rates that are at least equal to a defined minimum, then the statute creates an individual entitlement on the part of every provider to be reimbursed at that minimum, regardless whether the minimum is defined by reference to providers' costs, recipients' access, quality of care, market rates, or a fixed sum.

Thus, contrary to the Fifth Circuit's conclusion that "it cannot be said that section 30(A) necessarily confers upon each provider an individual right to a particular payment," Section 30(A) clearly does confer upon each provider an individual right to be paid at rates that are at least equal to the statutory minimum. See Wilder, 496 U.S. at 510 ("There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms benefitting health care providers: It requires a state plan to provide for `payment of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.' ") (internal alterations omitted). Cf. W. Va. Univ. Hosps., Inc. v. Casey, 885 F.2d 11, 21 (3d Cir. 1989), aff 'd on other grounds, 499 U.S. 83 (1991) ("Who else is more aggrieved by the absence of an adequate or reasonable hospital reimbursement rate than a disadvantaged hospital and who has a more compelling interest to press for a correction?").

47

V.

Finally, although one can find isolated instances of Medicaid recipients suing to enforce Section 30(A), see, e.g., Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908, 931–32 (5th Cir. 2000); Ark. Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 522 (8th Cir. 1993), I do not share the majority's optimism that lawsuits brought by Medicaid recipients will provide sufficient private enforcement. See Maj. Op. at 21–22 ("If, as the plaintiffs in this case allege, the rates set under the HealthChoices program are so low that compliance with the `quality of care' and access requirements is threatened, we see no reason to believe that recipients in the affected area of the Commonwealth will not seek legal redress to ensure that these critical mandates are met."). Medicaid recipients are, by definition, people facing severe financial hardship, and therefore are unlikely to have the same access to legal services as healthcare providers.5

Moreover, Section 30(A), by its express terms, uses provider reimbursement rates as the means of ensuring recipients' quality of care and adequate access, and healthcare providers are more likely than Medicaid recipients to possess information about the relationship between current provider reimbursement rates and recipients' quality of care and access to care and services. Indeed, few if any Medicaid recipients will even be aware of current provider reimbursement rates, much less have an idea of how a particular rate compares with provider costs

_____

5. To be sure, attorney's fees are available to a successful S 1983 plaintiff. See 42 U.S.C. S 1988 ("In any action or proceeding to enforce a provision of section[ ] . . . 1983 . . . of this title, . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ."). Awards of attorney's fees may be inadequate to induce attorneys to represent Medicaid recipients in Section 30(A) cases, however, since such attorneys would assume the risk of earning no fees if the lawsuit is unsuccessful. See City of Burlington v. Dague, 505 U.S. 557 (1992) (holding that in determining the reasonableness of attorney's fees under federal fee shifting statutes, courts may not enhance the fee award above the "lodestar" amount to compensate attorneys for assuming the risk of receiving no payment for their services if the lawsuit failed).

and the reimbursement rates offered by non-Medicaid healthcare plans. Nor are Medicaid recipients likely to have ready access to statistical information on the extent to which healthcare is available to the general public, for purposes of determining whether current reimbursement rates comply with Section 30(A)'s adequate access mandate. By contrast, professional associations such as the pharmacists association plaintiff in this case are more likely to possess the market data necessary to determine whether a colorable claim under Section 30(A) exists.

In sum, because Section 30(A) is expressly addressed to the financial incentives of healthcare providers to participate in Medicaid, healthcare providers are well-situated to vindicate recipients' and providers' shared interest in ensuring that provider reimbursement rates are consistent with quality of care and sufficient to guarantee Medicaid recipients access to care and services to the same extent as the general public. These practical considerations further support the result compelled by Wilder .

VI.

Because I believe that the question whether providers may bring S 1983 actions to enforce Section 30(A) is squarely controlled by Wilder, I would decline to follow Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908 (5th Cir. 2000), and would join those Circuits that, relying on Wilder, have permitted providers to bring such claims. See Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen, 93 F.3d 997, 1005 (1st Cir. 1996) ("[W]e conclude that plaintiffs possess standing . . . to enforce section 1396a(a)(30) . . . ."); Methodist Hosps., Inc. v. Sullivan, 91 F.3d 1026, 1029 (7th Cir. 1996) ("We therefore . . . hold that providers of medical care have a private right of action, derived through S 1983, to enforce S 1396a(a)(30)."); Ark. Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 528 (8th Cir. 1993) ("[T]he equal access provision [of Section 30(A)] may be enforced by Medicaid recipients and providers using 42 U.S.C. S 1983."). I thus respectfully dissent.

To hold as have these other Courts would not of course be the end of the case, for the plaintiffs would still have

49

significant hurdles in the next phase. In particular, plaintiffs would have to demonstrate that they have produced sufficient evidence for a reasonable jury to find that the current reimbursement rates are so low that they violate either the quality of care or adequate access mandate contained in Section 30(A), a question on which I express no opinion here. Since the Court has not gone beyond the threshold issue of whether S 1983 grants providers a right of action to enforce Section 30(A), I would reconstitute the original panel so that it may resolve the merits of the Department's summary judgment motion, which requires determining whether plaintiffs have produced sufficient evidence for a reasonable jury to find that the challenged reimbursement rates violate Section 30(A)'s quality of care and adequate access mandates.

50

RENDELL, Circuit Judge, dissenting, with whom Chief Judge BECKER joins:

I join in Chief Judge Becker's thoughtful dissenting opinion and write separately only to offer a permissible reading of the statutory language different from that urged by the majority. The majority terms the language"complex" and "breaks it down." However, I see it as fairly straight-forward -- at least regarding what we need to decide -- when properly parsed. If we were to "parse" the statute at issue in grammarian fashion, we would note that the"state plan" is the noun, "must provide," the verb, and "methods and procedures," the object. Then comes the descriptive phrase "relating to the utilization of, and payment for, care and services available under the plan." The methods and procedures must relate to the use of care and services -- by individual recipients -- and the payment-- to providers -- for care and services.

What then follows in the statute -- preceded by"as may be necessary . . ." -- is no more than a further descriptive phrase setting forth the barometer or standard against which the utilization and payment methods and procedures are to be measured. Why should only the users be able to challenge a plan that must pass muster not only in terms of the methods and procedures for "utilization," but also the methods and procedures for "payment?"

I think it eminently reasonable to conclude that both aspects -- use and payment -- are foci, and that both constituencies can speak to whether the statutory requirement ("as may be necessary to . . .") has been fulfilled, and both should have the right to complain that in fact it has not.

Also, in response to the majority's footnote 15, I submit that I am not ignoring the second part of the provision, and I do not view the provision as hopelessly vague. Rather, I see no need to mention it because it sets forth a standard that is quite susceptible to proof. I have little difficulty imagining the gist of the testimony of recipients, providers, and state administrators as to how the procedures in place impact the sufficiency of payment and quality of service, so that judicial decision making can be exercised. I do,

51

however, continue to have difficulty in understanding why there cannot be two intended beneficiaries, especially if the statute is designed to benefit one (the providers) in order to provide the desired level of services to the other (the recipients).

Further, I suggest that the fact that the language post-repeal of Boren continues to reference "rates" is actually quite insignificant. In repealing Boren, Congress replaced the standard for the rates ("reasonable and adequate") with the requirement that the state provide for a public process for determination of rates. What is significant, however, is the fact that the Boren Amendment language that had been held to afford a cause of action required that rates be "reasonable and adequate," and the language we are quibbling over similarly describes a standard for payments to providers. I see no meaningful distinction between the two and therefore respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit